We'll hear argument first this morning, Case No. 16-1498, Washington State Dept. of Licensing v. Cougar Den. Mr. Purcell. Mr. Chief Justice, and may it please the Court, Washington's fuel tax taxes fuel, not highway travel. The tax is nondiscriminatory, and its instance is off-reservation, so it applies to Cougar Den unless preempted by expressed Federal law. Nothing in the Yakima Treaty preempts this tax. The treaty guarantees the tribe the right, in common with others, to travel by public highway, but it says nothing that would preempt a generally applicable tax on goods like this one.  of the United States. Sotomayor, could you tell me, could you tax the tribe's buying of the fuel in another State? They take the truck, they leave your State, they go to another State, they buy the fuel. Can you tax them in the buying of that fuel? The other State could certainly tax them that, Your Honor. They've conceded that. Whether we could tax them as a matter of State law, I don't think so, but not, certainly not under the treaty. So the question is, in my mind, whether the travel rights to freely use the highways permit you to tax them for an incidence carrying the fuel from another State on a highway through your State, correct? Now, the court below called this an importation tax. You've been resisting that, and you call it a use tax. But if it's an importation tax, it's not equally applied. There are wholesalers of all kind who can import without paying the tax, correct? Not if they lack a license like Cougar Den, Your Honor. An unlicensed entity owes the tax when they bring the fuel into the State, regardless of how they do so. And licensed entities that buy fuel in the State pay the tax immediately within the State. So this tax applies to fuel purchased in Washington or outside of Washington. Sotomayor, what is the license? Is it a way to get them not to pay? Who pays for the fuel, then, once you're licensed? You're a wholesaler, you bring it in, I'm assuming by vessel or by pipeline. Well, then the person who buys the fuel uses it, correct? Well, if you're bringing it in to a terminal or a refinery, then the tax is due when it's picked up at a terminal or a refinery. Who actually pays the tax is a complicated question, depending on whether the entity that owns the fuel in the tank is a supplier or not. But that's when the tax is due. If we accept that the travel provision entitled this tribe to travel with goods back and forth to a market without a tax, without a license, just like in the fishing rights case, then what gives you the right to charge them within the State? Meaning, they're traveling free of tax, free of license. They go to the reservation, you can't tax them on the reservation. So I'm not quite sure what permits you to tax them at all. If you can't tax them when they picked up the fuel. There's two crucial points about that, Your Honor. First of all, Couer d'Anne concedes that we could tax a purchase or sale that a Yakima member makes outside of the reservation, even though that would not have been taxed in 1855. What's doing the work? At the market. At the market, yes, but you've just admitted that at the market where they picked this up, you couldn't tax them. Well, the point is, Your Honor, the treaty did not preserve everything exactly as it was in 1855. The key point here is that this Court has adopted a clear rule that as to off-reservation taxes, off-reservation State taxes can be applied to tribes if they're nondiscriminatory and if the instance is off-reservation, and here that's the case. So what I'm saying is that there are a lot of issues in this case, but just to make it easier for me, could I ask you to assume a couple of them and then we could focus on one? Sure. So, you know, one issue is, does the right to travel include the right to travel with goods? And I'm going to ask you to just assume that it does. And then another question is, does this treaty preempt generally applicable taxes? And that's you've been talking a lot about that. And I'm just going to ask you to assume that it does. In other words, you know, if you have a toll on a road, for example, the fact that it's generally applicable, you still can't apply it to members of the Yakima Nation. I'm just going to ask you to assume that, okay? So if both of those things are true, then it seems to me we come to me the hardest issue, which is how do we look at this tax? Do we look at it as a tax that is preventing the Yakima from doing exactly what they bargained for in this treaty? In other words, it's not preventing, but burdening the Yakima from traveling on roads with goods. Or you keep on saying, well, no, because it's not targeted at that. It's not directed at that. It's a more broad tax on the possession of fuel. And I guess what I want to ask you is why that matters. I mean, it does seem to me that from the Yakima's point of view, and they're after all the people who entered into the treaty, from the Yakima's point of view, this tax is burdening exactly what they bargained to get, which is the ability to transport their goods without any burdens, without a tax. No, Your Honor. This tax applies to the fuel itself, regardless of whether or how it's transported. I know you – maybe I'm not making myself clear. You're sort of saying, well, the tax applies in other circumstances to people who aren't transporting fuel. But I'm saying from the Yakima's point of view, they're transporting goods on the road exactly as the treaty says they can, and why do they care if you apply your tax in other circumstances as well? Why should they care? Why does it matter what the full scope of the tax is if from the Yakima's point of view the tax burdens exactly what they got as a result of its treaty? Because, Your Honor, this Court has never said that a person or a company can make an activity exempt from State law, an activity like fuel possession, by engaging in that activity while also engaged in a treaty-protected activity like travel. If that's the rule, then a Yakima member could possess illegal firearms or illegal drugs or diseased apples in their car, to just give a range of examples, and bring them into the State and say, your laws against these things violate my right to travel by public highway. And that cannot possibly be the right approach, or else it would preempt any sort of State  Sotomayor, but even in the fishing rights case, which you don't see as comparable, but others might argue it is, the State can regulate for public interest conservation points. The Indian tribe has conceded that you can regulate for public interest on a highway. That wasn't superseded by the treaty. But what they bargained for was to carry goods back and forth from the market without a burden. That was their bargain, just as under the Fishing Rights Treaty, they can go and collect fish without paying a tax or getting a license for that fish. Your Honor, in Tuley, this Court said that the State cannot tax the very right at issue, the right to fish. But here, that is not at all what's happening. Sotomayor imposed a toll to do it. Well, and the Court has never said that the State can generally regulate the fishing right in the public interest. It's only said that the State can regulate for the conservation of fish. Well, that's the public interest. Well, but, but, but, Cougar Dan is seeking to expand that to say the State can do anything that would protect public safety, and this Court has never said that about the fishing right. So that's sort of a convenient addition that they've conceded, but it's not found anywhere in the treaty text. And so they're, they're essentially asking this Court to, to find kind of reasonable regulations that are okay without any basis in the treaty. Well, counsel, is that so? I mean, I thought the interpretation of the phrase in common with, by the district court in Yakima Indian Nation was that it allowed the State to impose certain regulations that facilitate both native and non-native travel along the same highways. So safety regulations, speed limits would facilitate travel in common. That's what the district court held in Yakima Indian Nation. Of course, that wouldn't cover something like, for example, regulating firearm possession or diseased apple transportation. But it does regulate the questions that we've been talking about in terms of, it does provide some safety regulations, for example, right? Well, presumably that would allow, for example, a speed limit, but not any other sort of regulation on the goods themselves, which is what the State's trying to do here. I mean, what's odd under the Court N's theory is that the State — But that's all that, under the Yakima Indian Nation holding, that's all that the treaty would allow you to do. And I guess I'm wondering, in the first instance, why you're not a stop from arguing a different position today? For a number of reasons, Your Honor. First of all, this Court has always treated treaty interpretation as a question of law for this Court to decide de novo. And that's how this Court has always approached treaty interpretation. It has never considered itself bound by legal conclusions reached by a lower court. Even in the same case — Well, I don't feel bound. I wonder if you are, though. No, Your Honor. We explained in our reply brief, as a matter of State law, the argument is just completely wrong that we're bound by any of those statements in the ALJ's ruling or the Superior Court ruling. But more importantly, this Court has never considered itself bound by what are really legal conclusions in a district court opinion. And the Yakima Indian Nation dealt with a very narrow issue of a fee as a precondition to use the highway. That is not what we have here. Coubertin and the Yakima Nation are free to use the highway and not pay this tax. What they can't do is possess fuel and bring it into the State or purchase it in the State without paying the tax. But they were told at the time of the treaty that you could go on the roads to take your things to market, as if you would be treated off reservation, as if you were still on the reservation. The first part they were told, Your Honor. The second part they were not. That is a misquote that the other side is using from the — But the effect, the effect was that in taking your goods to market, which was the promise, in exchange for a huge area of land, an area of land the size of the State of Maryland that was given up by the tribe, that you could take your goods to market. And this burdens, as Justice Kagan said, this burdens substantially their ability to take goods to market. Your Honor, the Yakima remain entirely free to take goods to market. And Cougar Den has conceded that the State can tax their trading of goods off reservation as they must. So the idea that the treaty preserved things exactly as they were in 1855 in the Yakima trading practices is just — Kagan. But what the treaty seems to prevent is the State from taxing either travel or, as Justice Kavanaugh says, travel with goods. Isn't that exactly what they got in exchange for their land? Your Honor, the best reading of the treaty is that it does not preempt nondiscriminatory taxes that apply equally to everyone. The treaty says it guarantees a right in common with others to travel by public highways. And none of the reasons the Court deviated from that ordinary meaning in the fishing cases apply here. But even if the Court decided that it guaranteed the Yakima some right beyond what it guaranteed others in terms of traveling without paying a fee for traveling, what we have here is not a fee for traveling. This fee does not turn, this tax does not turn in any way on use of the highway. It's paid on fuel purchased in State, fuel purchased out of State. If Coubertin brought this fuel into Washington and immediately put it into a tank on the other side of the State line, they would still owe the tax, even if they never traveled any farther. Kagan. The tax legislation taxes a wide range of activities. One is it taxes fuel that's removed in the State from a refinery. But the one that's being applied here is that it taxes motor vehicle fuel entering into this State. So entering into, this is a pretty standard importation tax, which is to say that it's taxing the travel of goods into the State, which again seems to be what the Yakima got as a result of this treaty, the ability to take goods to market and to take goods from market, regardless where that market is. But again, Your Honor, the fuel, the tax applies to fuel purchased inside Washington and outside of Washington and brought into Washington by any means. It would apply if they were bringing it in by private toll road. It is not a tax on using public highways. And the happenstance of where the State line is was not certainly a factor in the 1855 treaty negotiations. What Cougar Den is essentially arguing -- Kagan Do you contest, I mean, if you said what is Cougar Den doing, how would you describe what Cougar Den is doing, what its activity is? Because the way I would describe Cougar Den's activity is that it's bringing goods from market. Well, two things about that, Your Honor. First of all, the treaty does not -- I just really asked, how would you describe Cougar Den's activity? Sorry. I would describe it as possessing fuel in Washington, Your Honor. That is why they pay the tax. Keep in mind, Cougar Den is not even doing the transporting here. You would describe it as possessing fuel as opposed to transporting fuel? They owe the tax because they possess fuel. They are not transporting the fuel. So if Jack says, I'm taking my pigs to market, and somebody says, what are you doing, Jack? He says, no, I'm taking my pigs to market. No, I think you're possessing your pigs, Jack. Well, if the State had a rule that diseased pigs could not leave a certain area, under the – under Cougar Den's theory, the State could not apply that rule. And so this is a regulation of the goods, a tax of the goods, not a tax on the travel. That's the crucial point here. That's one of the crucial points. The other crucial point is, under the best reading of the treaty, this is a nondiscriminatory tax that applies to everyone. And so it would not be preempted, even if it were. That reading of in common with was rejected by the Court in the fishing cases. It was, Your Honor, but none of the reasons the Court gave in those cases apply here. So the Court really gave three reasons. And in the Tulee case, the Court said it was despite the phrase in common with others that it was going to read the fishing right as creating a greater right for the tribes than for non-Indians. And there were sort of historical, textual, and practical reasons. And the practical reason, first and foremost, was an equal right would have left no fish for the Indians to take because they're so vastly outnumbered by non-Indians. And that's just not the case here, allowing equal access to the highway. Roberts. Counsel, we normally read a phrase to bear the same meaning in all of its applications. And we wouldn't normally read the term in common with to mean one thing when it's fishing and another thing when it's highways. Would we? That would be kind of an extraordinary reading of a statutory term. Fair enough, Your Honor. But in Tulee, this Court said it was sort of deviating from the normal meaning. What do you think about that, though? I think you had good reasons for deviating from the normal meaning in Tulee that do not apply here. And so I think the Court should give the phrase the normal meaning. But having adopted one reading of it, why wouldn't we be consistent? Because none of the reasons you gave in those cases apply here. The textual reasons are practical. Well, the next concern would be then what we do about the fact that this is also how the district court concluded it after very careful reading in Yakima Indian Nation about the history of the treaty and looking at the original understanding of both parties and its original meaning at that time. And that the Indians understood it not to mean common regulation applicable to everybody, but again, that they would be able to do the same things that they've always done just with non-native persons present. The meaning of the treaty, of course, is a question of law for this Court to decide de novo. And if the Court doesn't want to reach that issue, of course, you can simply say that whatever the treaty means about travel, this is a tax on goods. I'd like to reserve the remainder of my time for rebuttal, if I may. Roberts. Thank you, counsel. Not so fast. I did that once, too. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. Article III of the Yakima Treaty does not exempt tribal members from paying Washington's motor fuel tax. The treaty protects the right in common with others to travel upon the public highways. It does not give tribal members immunity from excise taxes on goods that they're carrying inside their trucks, that they're brought outside of the reservation or obtained outside of the reservation for trade or for any other purpose. Respondent acknowledges that tribal members are not exempt from the economic framework for trading goods that has developed outside of the reservation. If Respondent had obtained this fuel from a refinery in Washington, it could be taxed for that transaction. If Oregon had charged a tax on this transaction, the Respondent would have to pay it. Washington's tax is an economic burden on the fuel that's being carried in the truck. It's not a restriction on their ability to use the highway in common with others. I assume I think you're mostly right. But what about the fact that it's gasoline? I mean, can the State impose tolls on the highway, say they really want people to use mass transit, we're going to have a $1,000 toll? I don't think. Breyer, can they do that? The State, well, the State could impose a $1,000 toll if it was doing that for everybody. Breyer, yes, doing it for everybody. Now, by the way, nobody or hardly anyone can use the highways, including the truck. I think that hypothetical is quite unlikely simply because there's a. I believe that there are unlikely to impose it. That's why it's a hypothetical. There's an anti-discrimination rule built into the rule. No, no. Everyone has to pay the $1,000. Right. Including the tribe. And then if you're going to say they can do that, I really do find it difficult to distinguish the fish. There could be some restrictions, Justice Breyer, like if you posed a, you know, a million-dollar tax on everybody to use. No, no. It's $1,000. And of course, as soon as you agree to that, I'm going to say it's only 50. And then I'm going to say it's 10. No, right. And the read what I'm driving up, I would have thought they can't do that. But if they can't do that, this is gasoline. And maybe all those Oregon and California and other places, and everybody pays it. That's true. But if you pay a high gasoline tax, it's pretty hard to travel. And they're supposed to be able to travel on the highway. Just as if you get all the salmon out of the river, it's pretty hard to fish. I suppose there could be circumstances where the restriction that's placed on travel on the highway are so severe that it undermines. Breyer. Or can you say that they have the they cannot take steps to remove significant numbers of salmon from the stream, and they cannot take steps sufficient to significantly limit the right to travel on the highway by these people? Do what you want for the other citizens. So I think there's a couple of distinctions that we need to draw between what you're hypothesizing and what is happening here. The first is that, yes, there could be circumstances in which the restriction that's imposed is so severe that it burdens the actual ability or right to travel on the highway. But there's How much is the tax? Excuse me? How much is the tax? Well, we don't think that – I mean, I don't know. I know you don't think it's relevant, but if I happened to think it was relevant and asked the question, how much is the tax, what would the answer be? I don't have a number to give you. I think the, you know, district court could determine what was too burdensome that actually – But they didn't make any of these arguments, did they? No, that's correct. And I think the other thing is, even if you thought that the treaty preempted things like fees to use the highway, such as a toll or a licensing fee that was issued at issue in Cree, so you adopted the Ninth Circuit's rule of what kinds of things are preempted, it still wouldn't preempt this tax, which isn't a fee to use the highway. It's a tax, an economic burden on the goods that are being carried in the truck. The text of Article III secures to the Yakima's only the right in common with others to travel upon the public highways, and that right by its plain terms doesn't protect activities other than highway travel. There's nothing in the negotiating history either that indicates – Well, there's one central part, which is they traveled the highways for free. They weren't burdened by economic manner in traveling the highway. So we go back to Justice Breyer's question, which is whether it's 50 cents or a million dollars. You're saying if it's 50 cents or 5 or 10, presumably, it's okay. You can burden them with that. You just can't burden them – and I presume you would say every other citizen by imposing a million dollars. Is that your point? Well, I don't think the State is ever going to impose a tax that is so burdensome that nobody can travel on the highways, but yes, we believe that – So you're going back to the point that Justice Gorsuch ended with, which is that you're reading in common with all others differently in this context than in the fishing rights context. Yes. And I think the reason that it's different in this context than in the fishing context is because of the right at issue. I think there are textual differences and historical differences between those two clauses of the treaty. Well, the one difference that you can't get around is they didn't sign a treaty and give away that much real estate to get nothing in return, to be treated exactly like every other citizen in traveling the highway. No, I think one thing that is really important about this right to travel provision, the right to use the public highways, is that the tribe was receiving an assurance from Governor Stevens that if they gave up the rest of the land in exchange for the reservation, they would still be able to leave the reservation, they would still be able to travel throughout the area, and that they would be able to do so without discrimination against them, without taxes imposed or without rules imposed that were unique to Indians. Just say it, without taxes imposed. Without taxes imposed that were not applied to everybody else. What kind of promise is that, given the constitutional rights to travel and equal protection? Is that an illusory promise, the promise you've just described? No. I mean, I think at the time it was just a reassurance to the tribe that Governor Stevens was giving. There are examples cited on page 38 of the Petitioner's Brief where at the time, in the mid-1800s, there were restrictions on tribal members leaving reservations. There are instances where people would report back to Congress that the Indian agent on the reservation would issue a pass and tell the tribal members how long they could be gone from the reservation and for what purpose. Do you think any of that would hold up today? No, certainly not. But at the time, it was a reassurance from Governor Stevens that the tribe would The purpose wasn't just to leave the reservation, though. The purpose, as I understand it, was to leave for trade. And if you so burden the trade, that seems inconsistent with the purpose. I don't think, Justice Kavanaugh, that Respondent is even arguing that the trade can't be burdened once they leave the reservation. They acknowledge that the transaction, if they purchase the fuel in Washington, could be taxed, that it could be taxed if Oregon were to impose a tax here. So it's not that they're exempt from the economic framework for trade that's going on outside the reservation. If we could go back to the fishing cases for just a moment. Kagan, what is at issue is the transport of goods to and from the market, which is what it seems the Yakima is engaging in here. That's true. I mean, they are transporting goods from market, and they are when they come back from Oregon with the fuel. But that's not the treaty just protects the right in common with others to use the public highways. Kagan, if I disagree with you on that, and I hadn't understood that you were taking that position in your brief, but if I disagree with you on that, and I use, and I understand in common with, the way Tooley understood in common with, then it seems, well, there they are. They're doing what this treaty says the, the, this, they're doing exactly what this treaty protects, which is transporting goods to and from market. I think that under that view, Justice Kagan, the most you could get is to the Ninth Circuit's line, where they've said that the State can't impose a fee like a licensing fee or a toll or something like that to use the highway, even if it's being imposed across the board. What's happening here is a different type of restriction. It's an economic burden on the goods that are being transported to and from market that the Respondent concedes it could be taxed for at the, at the purchase point. Kagan But not because of the, but not at the movement point. Not, not when it, the, the goods go from one State to another on the highway. Right. But the distinction between those things, I think, is pretty thin. Oregon could have, could have taxed this transaction. It doesn't, because Oregon, like Washington, doesn't place a tax on fuel that's headed out of the State. They assume that it will be taxed once it gets to the next State. Kagan Well, it might be thin, but shouldn't we say that the State has to do things the right way, which is to say the State has to do things without violating the treaty? And if the State has another way to do it, go for it. I think the, the State has tried many different ways to impose this tax that have been struck down by various courts. What the State has done here is basically followed this Court's advice in Wagnon, which is to move the incidence of the tax up the supply chain to off the reservation. Now the State has done is to tax exactly the activity that's protected under the treaty, which is the, which is the transportation of goods to and from market. I don't think so. There's, I think there's a distinction between, if you think that, that the, the tribe wouldn't be subject to a uniform tax if it taxed the very thing that they were trying to preserve, which was the ability to use the public highways, then that would just, it would just mean that you couldn't charge them a fee to use the highway or something like that, not that you couldn't tax the goods that are in the truck. I think one, thank you. Roberts Thank you, counsel. Mr. Unikowsky. Unikowsky Mr. Chief Justice, and may it please the Court. The Yakima Treaty preempts the application of the fuel tax to Respondent for two reasons. The first reason is that when Respondent transports fuel, it exercises the right to travel secured by the Yakima Treaty. As such, it has the right to do that without incurring a tax obligation, regardless of whether this tax is styled as one on possession or transportation. Second, even if this case turned on what the tax is on, this really is a tax on transportation, because that's what the statute says and that's how the State court construed it as a matter of State law. Roberts So if this ‑‑ these were apples coming into the State of Washington and there was a fee to ‑‑ or they inspected the apples to make sure they weren't diseased, and the people who owned the apples had to pay that fee, is that problematic if it wasn't motor fuel, oil, but just apples to feed, to inspect the apples, prevent disease from spreading to other Washington apples? Unikowsky Your Honor, we wouldn't object to the inspection at all. We might object to the fee, but the inspection ‑‑ Roberts Well, in other words, everybody else bringing apples in has to pay the fee to inspect the apples, but the tribe doesn't, even though the fee can't be assessed if the tribe is transporting the apples? Unikowsky Yes. I think that if all the tribe is doing is transporting the apples, we absolutely agree that the apples can be inspected. We agree that for regulatory purposes, that's fine. Roberts But no fee can be assessed if the tribe is transporting the apples? Unikowsky Yes. I think that a fee that goes into the general treasury of the State cannot be assessed on the tribe when they are exercising the treaty right. Roberts Even if the apples don't belong to the tribe? They are bringing them to somebody, you know, they are just bringing them down the road. Unikowsky Well, it would depend on who has to pay the tax. So in this particular tax, if you just appoint an agent to transport it for you, you, the importer who appoints the agent, pays the tax. So I think that if the tax was levied on the person who ‑‑ so if the taxpayer was the person who owned the apples and they just hired an Indian in a truck to bring it, but the State let ‑‑ yeah, then I think that the ‑‑ Roberts Isn't that what's going on here? I thought it was the owner of the fuel that is taxed, not the transport. Unikowsky Yes, that's Cougarden, Your Honor. That's Respondent. The Indian owns the fuel. Roberts So it's not who owns ‑‑ it's not a separation between the goods and the transport, right? Unikowsky No, Your Honor. What the statute does is it says that it's the transportation that's taxed, but the tax is imposed on the owner. So if you hire someone in a truck to transport for something for you, it makes perfect sense that the State wouldn't want the trucker to have to pay this tax, which will probably exceed the fee he's getting for transporting it. So the State ‑‑ the statute imputes the act of transportation to the owner of the fuel. That's in the definition of motor vehicle fuel importer. And so in this case, Cougarden transports the fuel both via an agent, which is a contractor, and also it uses its own trucks. There's a declaration in the record that says that sometimes it uses its own trucks, sometimes it hires a contractor. But Cougarden would ‑‑ Breyer Well, it's the owner's transportation either itself or via an agent. The State's never distinguished, by the way, the transportation via Cougarden's own trucks and via its agent. That's just the argument the State did not make in its brief. And, you know, so ultimately it's the owner that pays the tax, and the idea is if you hire a trucker, that's not different from just using the trucks that you own. The point is the sine qua non of taxation under the statute is the transportation of goods to market, and whether you do it with your own truck or you hire someone else in a truck doesn't change the fact that you're paying the tax. Roberts I think this is the argument on the other side, that it's assessed per gallon. In other words, that suggests, as opposed to per mile that you're carrying it, suggests that it's based on possession if it's based on right there at that moment, how much do you have. They don't care where it's going. They don't care if you use it all up right at the border or whatever. It has nothing to do with travel. It's purely on the good itself. Gannon Well, I don't agree. I don't think that you can just say a tax is on a good. I think this Court has always required an analysis of the precise activity engaged in by the taxpayer. So the Wacken case, the argument that the tribe made in that case was that really this is a tax on the fuel that's sold at retail. And the test this Court adopted was you've got to have this focused analysis of what is the taxpayer doing that triggers the application of the tax. And in this case, the thing that the taxpayer is doing is importing the fuel. By its terms, the statute says that the taxable event is the entry of fuel into the State, so the traveling with the fuel. And the taxpayer under the statute is defined as the importer. And so I think that just has to be a tax on importation. And incidentally, it's not even just that it's the importer that pays the tax. The tax actually distinguishes for licensed importers between people who use highways and people who don't use highways. And I'm sorry. Alito, what if the statute said the first entity to possess the fuel in the State must pay the tax? So we would still say that's preempted, although our legal analysis might differ a little bit. Why would that be preempted? Well, first of all, I think that as applied to fuel that comes in from out of State, really first possession just is inherently importation. In other words, you can't be the first possessor of fuel, at least that originates out of State, unless you're the one hauling it into the State. So in that context, I just think first possession kind of means it. Alito, I thought you just said we have to focus on what the statute says is being taxed. So if the statute says expressly that possession is being taxed, that doesn't matter. Okay. So we have two arguments in our brief, a broader argument and a narrow argument. The broader argument actually doesn't depend on what the statute says. It depends on what the tribal member is doing. So if the tribal member can show that the only thing that they're doing is exercising a treaty right, which is to say transporting goods to market, then they don't pay the statute is styled. Alito, I mean, that's very artificial, and you get into this metaphysical question of what they're doing. They're doing many things. When they're, you know, when the farmer is bringing his pigs to market, he's doing many things. He's traveling with the pigs, he's possessing the pigs, he's breathing, he may be doing all kinds of other things. Well, yes, but I think that things that are inherent in transportation, like breathing while you're transporting it, I think would be sort of wrapped up in transportation. I mean, and on the facts of this case, what we have here is an Indian distributor transporting fuel to an Indian reservation to be sold to an Indian retailer on the reservation and potentially to Indian customers. Really, the only connection that Cougar Den has off-reservation is that it's hauling this fuel. Breyer, the thing I don't understand is that many States have laws against bringing in diseased apples, all kinds of things, all right? So if they don't bring it in, you can't transport it at all. So if your point is that they have a right to transport things, I would have thought you would have said a ban was worse, because after you don't. You say a ban is okay, but a tax isn't. That's your argument. Yes, that is our argument, Your Honor. Now, if a tax, what they do in this State is they have a tax which says if you buy goods to use in your house somewhere else, you have to pay a use tax when you bring it into our State. And then another State says, we're going to legalize marijuana, but we tax it pretty high. And another State says, we have, you know, I can go on and on and on. And you're saying, well, this tribe, it doesn't have to pay the tax on marijuana. It doesn't have to pay the ordinary sales tax, which take the form of a use tax in this State. And I could probably think of ten other examples. And my goodness, I say, why? Why not? Is that your position, what I said? No, it is not our position. We're not claiming at all. I'm glad it isn't, because my own position I had a good argument against. But I'd like to know what your position is, then. We are not claiming exemption from sales taxes. We draw a distinction between the acquisition of something, which is not travel, and the transportation of something, that is. So if you buy it. So especially for gas. Yes. So if you buy it. I didn't see that in your brief. I put the argument to them, and I just didn't see that in your brief, that you were in agreement with transportation. That's not your argument either. Okay. What is your argument? Our argument is that if you buy fuel and the State imposes a sales tax, as Your Honor referred to, then the acquisition of a good, it could be fuel, it could be apples, it could be anything, that can be taxed. That's not travel. But here, that's happening out of State. I don't think there would be a treaty problem with the taxation of that, but the State hasn't tried to tax that purchase in Oregon, and so that's out of the case. And so the only thing that the State is taxing in the State of Washington is the transportation. So it's actually a problem. Breyer. What do you mean, does it say it taxes the transportation? I think it does. I mean, it talks about the taxable event. It does? You know the statute better than I. Does the statute say we impose a tax on the transportation of gasoline? Your Honor, I'll tell you the words of the statute and then what the State court says. What's the answer, yes or no? It doesn't use the word transport, but the State court said it taxes transportation, and the State court authoritatively construes State statutes. What is the word? Enter. Enter is a movement. The taxpayer is, quote, the importer, and the State court. Now, what does the word of the statute? Entry. That is the taxable entry into the State. You get a tax. A tax is imposed when a good enters. Yes. A tax is imposed of 90 percent when marijuana enters this State. And you just told me that would be okay. The taxpayer is defined as the importer, and the State court construed the statute as a tax on transportation. An importer of marijuana must pay a tax of 90 percent. Yes. I think that you say that is legal or illegal. I think if it was a tax on marijuana, I don't see a difference between legal or illegal. If it was just a tax, it probably would be legal, Your Honor. You heard what I said. A tax, the statute says a tax on marijuana is imposed. Now, what were the words you used? I wanted to use the same ones. Upon entry of the marijuana into the State. That's all. I'm just trying to think. Our position does not depend on the good that's being imported. If it's a tax on fuel or a tax on marijuana, it would be the same thing. All right. So now what you're claiming is that, and this is what's bothering me and I'm trying to get to it, you're saying that the tribe, unlike anyone else in the State, can refuse to pay taxes that really have nothing to do with transportation, but have to do with  bad things out, which have to do with raising money for other reasons. Now, that, you see what I'm saying? The common sense of it is, why would this treaty give a tribe the right not to pay taxes that have really nothing to do with transportation, that's just the way, et cetera? Let me answer that in two ways. The first answer is, if it's truly a regulatory fine, if it's like you can't possess marijuana and we are punishing you, then we don't view that as a tax. We view that as a regulation. I think that, you know, the distinction between taxes and fines might in some cases be difficult to identify. Not in this case. This is definitely a tax. Alitoso, where do you get the difference between a regulation and a tax under the words of the treaty? So we're following this Court's decision in Thule and Yakima Indian Nation. I'm not trying to evade your question. The words of the treaty, I think it's the commonwealth language that opens the door to certain types of regulatory rules. I think that by implication, the fact that the Yakima ceded rights in all of this land probably opens the door to the State to protect public safety in that land, right? So if a person is carrying a firearm or diseased apples, which is going to cause other people to die, then there's a similar justification for permitting those laws as permitting speed limits. Alitoso, where does that come from? You prohibit certain things, you tax certain things. Where does that come from? Well, so this is the line the Court drew in the Thule case with respect to the fishing clause and in the Puyallup case. There's like explicit language saying we distinguish between the two. So we're following the Court's lead on this issue. And the Court has essentially said that a tax isn't necessary in the relevant sense. And so you don't need the tax to ensure that non-Indians can use the resource in common with Indians. And similarly, I don't think you need a tax to ensure, you know, public safety in the relevant sense, whereas I think that you really need to prevent, you know, diseased apples or firearms in order to protect public safety. If an off-reservation sales tax is okay, as you say it is, why is an off-reservation possession tax not okay? Well, I don't think this is a possession tax, Your Honor. I think it's a transportation tax. Suppose it is a possession tax. Is that then okay? An off-reservation possession tax. So we have a broader argument in our brief and a narrow one. So the broader one is not and the narrow one it is. So the broader argument in our brief is you've got to look at what the tribal member is doing. And because you can't – it's like a tax on breathing, right? You can't transport something without possessing it, just like you can't transport it without breathing it. That seems to be an argument that it's a sham that it's really getting to transportation. Sham might be too strong a word, but it's not. It's really about transportation, not possession. What if it's really about possession? So I think under the broadest possible version of our argument, we probably – but I'm not going to push this very hard. I think it would be preempted, but I'm not going to push it very hard because I think that this really is a transportation tax. I think it's actually quite helpful to look at why the statute is written the way it is, to understand why we really think this is a transportation tax. So I get that the overall goal of the State is to ensure that all fuel sold at retail is subject to a tax. But the natural way to do that is just to tax the retail sale, but this Court has held in the Chickasaw Nation case that those types of taxes are preempted, and, in fact, some Washington taxes were preempted. And so what the State decided to do is, as my colleague states, move the incidents outside the reservation. But the thing is, for fuel like this, when you have an Indian distributor hauling it from out-of-State to the Indian reservation to sale to an Indian retailer, the only connection between this fuel and off-reservation activity is that you're hauling it across this stretch of land. That's it. Roberts. Well, what if you have the tank where the fuel is going to go in, it's right by the border, and it's a tax on fuel that goes into the tank. They don't care what you do with it. You can transport it, you can do whatever you want to do with it. And it's owned by Cougar Den, the tank, and they then use it, transport it in their trucks. In other words, the State doesn't care about transportation. It just wants, as soon as it comes into the border, with no involvement by Cougar Den, it comes into, it's taxed in their tank, and then that's it. End of story as far as the State's concerned. I mean, I understand that overall the State just wants the money in some sense, but the reason it's structured this tax this way is because it knows that. Roberts. I'm talking about my hypothetical tax, okay? As soon as it goes into a tank, not one of the tanker trucks, then it's taxed on that. As soon as it enters into a tank at the border and it's taxed, is that okay? Nothing to do about transportation at all. Well, if you're referring to, like, taking the fuel from the truck and putting it into a big tank off the reservation at the border, if that's the hypothetical A non-Indian truck. Yeah, that, if that's the hypothetical, then that wouldn't be transportation. That would be delivery to some retailer or some other tank or something like that. So I think that we draw this, you have to look at the taxable event. If the event is the transportation, there's one result. If it's the delivery to a big tank outside the reservation, there's a different one. It doesn't say transportation. It says bulk entry or something like that, non-bulk entry. And what I'm actually bothered about is people are going to buy millions of things online. And so a State says the following, we just want our sales tax. And so they pass a statute that looks like this. When something you've bought online enters into the State, a tax is due. You know, that's pretty close to this statute. And what I'm having trouble is seeing how your argument, that's why I'm saying there's other arguments, where it's just fuel, but you don't accept that, okay. How your argument would permit the State to deny the State the right to tax the Indian tribe, when they've done what everybody else has done, just bought things online. And they haven't yet paid the use tax or haven't yet paid the comparable sales tax. Now, that's what's really bothering me. And if you can give me a minute or so on that, I would be helped. I'm happy to. So on the hypothetical of buying things online, I think it would depend on how the statute defined the taxable event. So of course, there's some recent developments in the law, in the Wayfair case involving out-of-State taxation. So if the State is capable of taxing the sale, in other words, the taxable event is the transaction itself, that wouldn't be a treaty issue. There might be other issues, Dorma Comma Clause, whatever. That wouldn't be a treaty issue. So if that is the incidence in some sense of the tax, if that's the thing that's being taxed, then that wouldn't necessarily be a treaty problem. So if the incident is shipping something into the State from out-of-State. That's what it was in the sales and compensating use tax case. Yes, Your Honor. So if, in other words, it depends on what's being taxed. So if it's the shipment on the highway and it's an Indian who's paying the tax, then I think that that would restrict the right to travel, because if it's a shipment of goods into our State, you're selling something to a State resident, you have to pay the tax, on the goods that are sold to an in-State resident. I think that, again, this Court has really drawn a distance, has not really talked about it in terms of a tax on goods. The Court has analyzed it in terms of a tax on the relevant activity. So there's a tax on the sale or a tax on the transportation, but you've got to look at what the taxpayer is specifically doing. I think that's what the Wagner – so I don't mean to evade your hypothetical. I just – it just really depends on exactly how the statute is structured. Alitoso, the fuel arrives by tanker and it is taxed when it reaches the port of Seattle, but everybody knows that at that point it's going to be transferred to trucks. Alitoso, owned by Cougar Den, would that be – what would your position be? That would not be preempted. First of all, it would probably be a non-Indian taxpayer who pays the tax, because assuming the tanker truck is owned by someone who isn't Indian. Well, I suppose it's owned by the tribe. Even so, I don't think so. I think that the Wagner case really, I think – Why? Why would it not be? Because the taxable transaction isn't the transportation of the fuel. We don't read this treaty as the State claims to have just this broad umbrella protection of any trade that's in any way facilitated by highway travel. What we say is that you've got to have a very focused look at what precisely is being taxed. So why does it matter whether it arrives by sea or across the border from Oregon? Well, if the relevant taxable event is the entry into a port by a boat. If the relevant taxable event is the possession, the first possession within the border of Washington. Well, it depends. In that scenario where it arrives by a tanker truck, the first possessor is someone who's using a big boat and is not traveling on public highways. So that possessor is not exercising any right under the treaty. Now, I understand there might be downstream economic consequences on Cougar Den, but I think that we're just trying to follow the analysis in the Wagner case, which has required this specific analysis of what's being taxed. I think the Wagner case, yes.          Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. The first is you could say, what is the taxpayer here doing? Is what the taxpayer here doing within the terms of the treaty? And there, it just seems to me that you win, because what the taxpayer is doing is transporting goods to and from market. You can say he's possessing the goods. You can say he's breathing while he's transporting the goods. But what he's doing is transporting goods to and from market. So that suggests that you should win, where the focus is on the activity taxed. But what I hear the state and the SG in its brief saying is you shouldn't focus on the thing that the taxpayer is doing. You should instead sort of look to the purpose of the state. You should look to what is the full scope of activities that the state is trying to tax and why they have this tax. And according to them, they have this tax because they want to get to every single taxpayer who possesses fuel in the state. And this is what's necessary to get to Yakima taxpayers. So what should we focus on? The activity that the taxpayer is doing or the purpose of the state legislation? So, of course, I think it's the activity, and I think that your question is really what this case boils down to. And I think there's a lot of reasons why the former answer is correct and the latter is not. First of all, I just think that the treaty right focuses on the Indian's right. It says the Indian has the right to trade and to travel, excuse me. I don't see a focus on sort of the holistic intent of the state in why it's enacting a particular tax. Also, I think in the Wagner case, the whole argument by the tribe in that case is that what the state was really trying to do was burden things on the reservation. The Court said we don't look at these broad assessments of purpose. We look at this formal analysis of the thing that's being taxed, and that's really just the analysis that we're asking the Court to do here. And actually, in the right to fish cases, the Court has done the same thing. Look, the Court has understood the right to fish as essentially providing an easement on private property to fish that preempts any state laws that would prevent you to going on the property. Those laws were the ultimate generally applicable laws. They applied to Indians and non-Indians. They applied regardless of whether you're going on the property to fish or to do something else. They had absolutely nothing whatsoever to do with fishing, but they were still held to be preempted because you looked at what the Indian was trying to do, which is fish, and the Court held that the treaty gave the Indian the right to do that. I think that's also true, by the way, with like the on-reservation tax versus off-reservation tax distinction. Like in Chickasaw Nation, this Court held that a tax on reservation activity was preempted. The tax at issue was not targeting Indian reservations. It was a generally applicable tax that applied to everybody. But as applied to protected activity, in that case on-reservation activity, the tax was preempted. Ginsburg. Are you going to say retailers, these are off-reservation, the retailers of the few. They are off-reservation or on-reservation? The retailers are exclusively on the reservation. That's why the State doesn't isn't able to tax the sale, because it's an Indian retailer. All of the retailers that Cougar Dan sells to are Yakima retailers on the reservation. And they sell to not people, not exclusively people on the reservation, right? That's true, but we haven't disputed that the State can order the retailer to collect the tax from non-Indian consumers. So if the State is concerned about collecting that tax, we haven't disputed that's the way to do it. And this is what the Court said in Chickasaw Nation. It says if the State wants to make sure this tax is collected from non-Indian consumers, it could just amend its laws to provide that. And we haven't disputed. Breyer, I'm not talking about non-Indians. I'm talking about the Indian consumers. I've now read the statute again, and it seems there are four relevant words. The tax on fuel applies when the fuel enters into this State. And now all I have to do is substitute for the word fuel things bought online, which could be anything at all, and then we can have diseased things or I don't know what, marijuana. And you are saying, and I think you are saying this, that this statute, which had to do with travel on the roads, applies to all those things, as long as they use the words the tax applies when it enters into this State. Now, I hope I'm wrong, or maybe I'm right. I don't know. I want to hear your answer. That's not exactly our position, because there's a few other things that have to be true. So first of all, the tax is not true. Yes, it also, by the way, has to be the case that it goes by FedEx or it goes by UPS or it goes by a truck or something like that. It can't just go by an airplane and be delivered by a drone. I've got that. Now, what else? So, again, we have a broader argument and a narrower argument. We do have one specific argument in our brief, which focuses on the fact that this traveled through the ceded area. Now, I think that it would still be preempted even if it was outside the ceded area, but sort of the narrowest argument in our brief goes like this, right? To look at what the Indians secured, you have to look at what they had, and they had something special on this particular stretch of land, which is a tax immunity. And therefore, if you want to look at what they kept, it's an immunity that applies specifically when the truck is going across that land. Now, I will say that for off for travel off the ceded area, I probably still would be arguing preemption, given that the treaty by its terms applies to all public highways. But the narrowest version of our argument in our brief really only applies to this particular travel because of the special rights that the tribe enjoyed on that stretch of land at the time of the treaty. The language of the treaty does not distinguish, though. That's correct. The ceded area and the other area. So the textual hook for that would be the word secured, which this Court has construed as requiring looking at what they already possessed. And another question, which is, your position depends on disaggregating possession and transportation. But you could possess something without transporting. You can obviously transport without possessing fuel. So the tax, why can't we disaggregate possession, transportation? Well, first of all, I think that in many ways these are State law questions. Like, there's this fundamental dispute in this case about whether this is just like one statute on first possession or a whole bunch of different subsections that are taxing different types of things, one of which is transportation. And it's kind of like a philosophical question, but I think that ultimately that's a State law question, not a Federal question. It seems to me if the State court is construing authority. So if a State court construed it differently from this State court, you would have a different position? I mean, I think I'd probably still try to argue preemption, but I think it would be much harder than the argument I'm currently making to you today. Because the Court has held that the incidence of the tax is a question of State law. It just seems to me that if the State court is saying that this is a transportation tax and transportation is treaty-protected activity, it just kind of follows like almost like inevitably that there's preemption because, you know, you're taxing treaty-protected activity based on the statute as authoritatively construed by the State court. I just would like to say one thing about why I think that, you know, what the State is doing here is quite inconsistent with, I think, what the expectation of the Tribe would have been in 1855, because the Tribe was actually specifically concerned about transporting fuel along this route, right? And so Governor Stevens promised in the treaty minutes you can take your goods to market to the river, which is a reference to the Columbia River, and this actually used to be their land. So as consideration for giving up this stretch of land, which at the time was their land, they agreed that they would continue to travel across it. They'd have the right to travel. And so I think it is a little bit of a bait-and-switch to the ACMAS to say, well, now we're going to basically exploit the fact that you have to travel across this stretch of land to impose this tax that we wouldn't otherwise be able to impose. And by the way, the effect of the tax is to mimic an attack on the reservation – on reservation retailers. And I think that, you know, I haven't talked about the treaty canon so far, because I think neutral principles are more than sufficient to resolve this case for Respondent, but at least under the generous interpretation principles for Indians, I don't think that's what the Indians thought they were getting, that this exploitation of the travel on the very land they gave up, securing for themselves the right to travel across it. I think that it's very natural and consistent with what I think the expectation of the ACMAS would have been, that they could continue traveling across that land with their goods as they were already doing it at the time, and that means transporting without paying a fee or owing an obligation to the State. Sotomayor, does it mean anything that this tax is literally on traveling the route, importing by the highway? There is no similar tax on importation by licensed people. They don't pay the tax, only the user who buys it pays the tax, correct? Yes. I think that's actually a very important point in this case, because the State casts this as a first possession tax, but honestly, that's just the State's gloss on it. That's not what it says. And in fact, that's not even how it operates, because if you're the first possessor via highway, you pay the tax. But if you're a licensed importer and you're a first possessor via a boat, you don't. Well, you want to characterize it as a transport tax, and the statute doesn't say that either. Well, I think that the State court is responsible for construing State law. It says import, which is the importer pays the tax. On page 121 of the Joint Appendix, the taxpayer is defined as the importer. And the State court said, which I think is intuitive, that importation is a species of transportation. And so there is an authoritative decision that this statute taxes transportation. So the problem is it's not consistent. You're right. The wholesalers, licensed wholesalers, are the importers, but they don't pay the tax. Yes. So this is not a tax on first possession. It just doesn't work that way. And the State is just adding this gloss that this is just one big tax on first possession, even though obviously when you just look at the words of the statute, it isn't one. And that's why I think the Court should just use the words of the statute, which talk about importation and entry and the construction of that by the State court, rather than determining preemption essentially by the gloss placed on the State's attorneys based on words that are not in the statute, nor did the State court think those things to be true. State the obvious. The value of the current value of the land the tribe gave up is enormous. It's a third of the State of Washington, I believe, Your Honor. Thank you. Thank you, counsel. Four minutes. Mr. Purcell. Thank you, Mr. Chief Justice. I'd like to point out two crucial facts about what will happen if you accept Cougar Den's position. First, to Justice Breyer's point, if you accept their position, the Acoma members can transport goods nationwide without taxation or regulation. That's why you see such a broad coalition of States joining in on our side. They don't have a treaty with everybody. They have a treaty with the United States, Your Honor. And as counsel just said, the right to travel says on all public highways. It makes no sense to limit it to the ceded area. Even historically, it wouldn't make any sense because the Acoma traveled beyond the ceded area. And also, Cougar Den is trying to use the history when it helps them by trying to limit the geography, but then not when it hurts them, like, you know, what goods can be transported or how it can be transported. Of course, the fuel and the highway and these roads did not exist at the time. The second crucial point — But on that one, didn't Mr. Unikowsky say, consistent with our case law, that there is a difference between taxation and regulation? And that's just a misrepresentation of the case law. The fishing cases I've said, the State can regulate fishing to conserve the fish to fish, the very thing that's the subject of the treaty. There's no similar — there's no similar rationale here. The Court has never said that we can regulate fishing more generally than that. There's no distinction in this Court's cases, in treaty cases, between taxing and regulation more broadly. Mescalero actually rejected exactly that argument. The second point is that under their theory, we could completely ban the transportation of fuel by highway if we did it for a regulatory reason, like we decided it's not safe. We could just ban it outright, and that would be fine. But we can't impose a generally applicable tax on goods, like fuel, because it happens to apply when Cougar Den travels on the highway. That makes absolutely no sense. There's no plausible way to read the treaty that would lead to that result. This is a tax on fuel possession. It is not a tax on highway travel. The State court explicitly said it would apply regardless of whether Cougar Den uses the highway. It is not a tax on transportation. It is a tax on the fuel itself. So even if you accept much of Cougar Den's position here, it does not lead to a ruling in their favor. And you can tell, as Justice Kavanaugh pointed out, that you can desegregate transportation from possession here because the statute does. And in fact, on the facts of this case, they're desegregated. Cougar Den is paying the tax even though they were not transporting the fuel. They possess the fuel.  So for all the fuel that they own, it's not a tax on the fuel itself. Robertson, has Washington considered taxing non-tribal members for their purchases on tribal lands? Your Honor, that is the system that we had before we adopted this system, and it was struck down by a Federal court in Washington. And then we adopted this tax model on what this Court said was okay in Wagnon. I'd also like to address, Wagnon just does not address the issue in this case. Wagnon was about who the tax applies to and where the incidence of the tax is. In this case, those things are undisputed. Cougar Den owes the tax and it's off-reservation. So the rule is that the tax can apply unless preempted by express Federal law. And here there's nothing in the Acoma Treaty that preempts this tax. There's just no plausible way to read the right to travel by public highway in common with others to preempt a tax on goods. So, you know, Wagnon just does not do what they're asking to do. Wagnon described a tax that the City of Washington modeled its tax on. And I just think it's crucial also to understand that even their limited ceded area argument does not work. It does not work. It's contrary to the treaty text, which says the right to travel on all public highways, and it's also refuted by the history that had the Acoma traveling beyond the ceded territory. So if there's no further questions, we ask the Court to reverse the State supreme court and hold that the tax applies to Cougar Den. Thank you. Roberts. Thank you, counsel. The case is submitted.